OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Deri on Jolly, filed June 26, 2008. On August 21, 2007, Jolly was indicted on one count of possession of crack cocaine (greater than five grams but less than ten grams), in violation of R.C. 2925.11(A), a felony of the third degree. On August 28, 2007, Jolly pled not guilty, and on September 13, *Page 2 
2007, he filed a Motion to Suppress. A hearing was held on the motion on February 8, 2008, and on February 29, 2008, the trial court overruled the motion. On March 28, 2008, Jolly entered a plea of no contest, and he received an agreed mandatory sentence of one year.
 {¶ 2} At the hearing on the Motion to Suppress, Sergeant Steven Abney and Officer Craig Coleman of the Dayton Police Department testified. According to Abney, on August 14, 2007, at around 11:00 a.m., he was driving a marked cruiser with Coleman, and upon turning from West Third Street onto South Broadway Street, they observed a vehicle heading north with "extremely dark" window tint. The tint was so dark that the officers were unable to see into the vehicle and determine the number of occupants.
 {¶ 3} Abney turned the cruiser around and initiated a traffic stop for the window tint violation. Both officers approached the vehicle, Abney on the driver's side. When Abney reached the vehicle, he observed that the window was down, and Jolly handed him his driver's license. Jolly was the sole occupant of the vehicle. Abney noticed an odor of marijuana. Abney also noticed that Jolly's "head was turned almost completely to the right towards the passenger side." Abney asked Jolly routine questions, and Jolly did not look at Abney, and Abney could not understand Jolly's responses. Jolly told Abney he had a cold. Abney observed a soda pop in the center console of the vehicle. According to Abney, it appeared that Jolly had something in his mouth. Abney "was trying to ask him if he was okay, was there a problem, and at that point he started reaching down onto the passenger's floorboard of the vehicle." Abney observed a brown bag on the floorboard, and he told Jolly to stop reaching for it. Jolly sat back up and began to choke. He then reached again for the bag on the floor, and he mumbled something and refused to look at Abney. After more attempts to reach the bag, despite being *Page 3 
admonished not to do so, Jolly was removed from the vehicle for officer safety and patted down. No weapons were found.
 {¶ 4} Abney and Coleman walked Jolly back to their cruiser, and Jolly continued to choke. According to Abney, the choking "was more than just a cough * * * [h]e had something in his throat, * * * he was either trying to vomit or something." Once Jolly was in the cruiser, but before Abney closed the door, Jolly "acted like he was going to throw up." Abney returned to Jolly's vehicle and searched it for weapons and drugs, and he found none. A soda pop and a bag of chips were in the brown bag on the floorboard.
 {¶ 5} After the brief search of the vehicle, Abney returned to the cruiser, where Jolly was "still acting like he's going to throw up, like he's sick." Abney opened the back door of the cruiser and told Jolly to stick his head out of the cruiser if he was going to vomit. Jolly kept choking, so Abney twice "said if you've got something in your mouth, you need to spit it out, and at that point he spit out a big chunk of plastic, and it landed on the street." Inside the plastic was a substance that field tested positive for cocaine. Jolly was read his rights and placed under arrest for drug possession, and he was also given a ticket for the window tint violation. Jolly indicated to Abney that he was going through some hard times and needed money.
 {¶ 6} Coleman testified that he initially approached the passenger side of Jolly's vehicle, and he observed that the passenger side window was approximately one third down. Coleman's testimony regarding Jolly's choking behavior and repeated attempts to reach the bag on the floorboard was consistent with Abney's. Coleman observed Jolly drinking a Pepsi that was in the console, and it appeared to Coleman that "whatever was in his throat was stuck." Coleman testified that Jolly mumbled to the officers that they could search the car after he was *Page 4 
removed from it. Coleman did not smell marijuana. Coleman sat in the front seat of the cruiser with Jolly while Abney searched the vehicle, and he obtained Jolly's social security number from him. The vehicle did not belong to Jolly. Finally, Coleman testified that he used a tint meter on a window of the car and determined the window tested "was in violation of the State of Ohio code for window tint."
 {¶ 7} In overruling Jolly's motion to suppress, the trial court determined that Jolly was lawfully pulled over for the window tint violation. The trial court determined that the officers, upon observing Jolly choking, were entitled to use reasonable force to prevent Jolly from swallowing evidence, and the court noted that the officers did not use physical force. The trial court recognized that the officers had legitimate safety concerns when Jolly refused to stop reaching for the brown bag on the floorboard as instructed by Abney. The court noted that Jolly gave permission for the officers to search the vehicle, and that Jolly spit out what was choking him, concluding, "[n]o violation of Defendant's constitutional rights occurred while these events unfolded." Finally, the court distinguished the authorities relied upon by Jolly and found that the officers did not extend a valid traffic stop into a fishing expedition.
 {¶ 8} Jolly asserts one assignment of error as follows:
 {¶ 9} "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS."
 {¶ 10} According to Jolly, he "should have been free to leave rather than secured in the back of the squad car," and the officers had no reason to detain him.
 {¶ 11} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, *Page 5 
and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14, 2007-Ohio-192, ¶ 11.
 {¶ 12} The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained. Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6L.Ed.2d 1081.
 {¶ 13} "When a police officer stops a motor vehicle for a traffic violation, the stop itself constitutes a `seizure' within the meaning of both the Fourth Amendment of the United States Constitution;Berkemer v. McCarty (1984), 468 U.S. 420, 436-37, 104 S.Ct. 3138, 3148,82 L.Ed.2d 317, 332-333; and Section 14, Article I, of the Ohio Constitution; see Dayton v. Erickson (1996), 76 Ohio St.3d 3, 11,665 N.E.2d 1091. The temporary detention involved in a *Page 6 
traffic stop, however, is not considered `custody' triggering theMiranda protections of Fifth Amendment rights. Berkemer,468 U.S. at 440. It is, instead, more akin to a `Terry stop,' during which a police officer may briefly detain a person and conduct an investigation upon a reasonable suspicion of criminal activity. Id at 439 (citing Terry v.Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889).
 {¶ 14} "Thus, the initial inquiry regarding the constitutionality of a traffic stop is whether a police officer's observations `lead him reasonably to suspect' that the person he wishes to detain has committed, is committing, or will commit a crime. (Internal citations omitted). When police observe a traffic offense being committed, the initiation of a traffic stop does not violate Fourth Amendment guarantees * * * . (Internal citation omitted)." State v. Wineberg, Clark App. No. 97-CA-58, at 2-3. Here, there is no dispute regarding the window tint violation, and the initiation of the traffic stop by Abney and Coleman did not violate Jolly's Fourth Amendment guarantees.
 {¶ 15} "Nevertheless, even when the initial detention is permissible, a court must inquire whether the stop and the investigation are `reasonably related in scope to the purposes for their initiation.'Berkemer, 468 U.S. 439. A traffic stop implicates a lower level of constitutional protection because the resulting detention is `presumptively temporary and brief and the police presence is `comparatively nonthreatening' an[d] `noncoercive.' Id. at 437, 440. The logical corollary of this rule is that, when a traffic stop exceeds the duration and scope of what is `reasonably related' to the traffic investigation (or the investigation of other crimes for which police develop reasonable suspicions), it becomes a custodial detention. `If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders *Page 7 
him "in custody" for practical purposes, he will be entitled to the fully panoply of protections prescribed by Miranda. Id. at 440."Wineberg, at 3.
 {¶ 16} Ordering a traffic misdemeanant to remain in the cruiser for the length of the detention, however, "requires no further constitutional scrutiny if the stop itself was justified," because the order "is a modest incremental intrusion justified by the nature of the traffic stop itself." Wineberg, at 5. In other words, placing a defendant in the patrol car by itself does not render the detention custody "nor impermissibly exceed the scope of a conventional traffic stop." Id.
 {¶ 17} Finally, "[w]here a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others." State v. Bobo (1988),37 Ohio St.3d 177, 524, N.E.2d 489, paragraph two of the syllabus.
 {¶ 18} Here, having approached Jolly's vehicle, Abney and Coleman, experienced officers, observed conduct that they were able to articulate that raised concerns for their safety. Jolly refused to look at Abney, Jolly was in obvious distress, Abney could not understand Jolly's responses to his routine questions, and most importantly, Jolly ignored Abney's order to stop reaching for the bag. For their safety, the officers were entitled to remove Jolly from the car and pat him down. Placing Jolly in the cruiser did not render his detention custody nor exceed the scope of Abney's legitimate investigation of the window tint violation. Further, Abney had smelled marijuana in the vehicle, and reasonable suspicion existed to detain Jolly past the initial stop for the window tint violation. Upon being removed from the car, Jolly gave his permission for the car to be searched, and Jolly was not detained in the cruiser for any more *Page 8 
time than was necessary to complete the consensual search and issue a citation.
 {¶ 19} Finally, as noted by the trial court, officers are permitted to use reasonable force, if necessary, to prevent a suspect from swallowing evidence. Wayne R. LaFave, Search and Seizure: A Treatise on theFourth Amendment (4th ed. 2004) § 5.2(i) at p. 136; State v.Victor (1992), 76 Ohio App.3d 372, 601 N.E.2d 648; State v.Burnett, Hamilton App. No. C-040386, 2005-Ohio-1323. Here, no force was necessary, since Jolly spit out the plastic that was causing him to choke as instructed by Abney. Under the totality of the circumstances, Abney's directive was justified, and as the trial court noted, no constitutional violations occurred.
 {¶ 20} There being no merit to Jolly's sole assignment of error, it is overruled. Judgment affirmed.
 WOLFF, P.J. and GRADY, J., concur. *Page 1